UNITED STATES of America,
Plaintiff,

v.

Agop KISMETOGLU, Defendant.

Crim. No. 8315.

United States District Court,
C. D. California.

Oct. 22, 1971.

---

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civil Division, Larry L. Dier, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Robert N. Harris, Jr., Los Angeles, Cal., for defendant.

## JUDGMENT OF ACQUITTAL AND ORDER CONDITIONALLY GRANTING DEFENDANT'S MOTION FOR RETURN OF PROPERTY

PREGERSON, District Judge.

A trial having been held on the Indictment filed herein charging the defendant, Agop Kismetoglu, with the commission of a violation of Title 18, United States Code, Section 545 (Smuggling goods into the United States), and the jury having returned a verdict of guilty, the defendant has moved for judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and for return of the property that was seized from him by the Bureau of Customs.

On a motion for judgment of acquittal the Court must decide whether the evidence is insufficient to sustain a conviction of the offense charged. In reaching his decision, the Court must view the evidence in the light most favorable to the government.

This has been a vexing case. The gravamen of the offense is the clandestine introduction into the United States with specific intent to defraud the United States, of merchandise that should be

declared to customs inspectors. The evidence brought out the following facts:

On the evening of June 4, 1971, the defendant, who is 41 years old, his wife, and his three minor children arrived at Los Angeles International Airport aboard a Lufthansa flight from Beirut, Lebanon. Upon arrival their luggage contained 167 watches and 1841 pieces of gold jewelry. The bulk of the jewelry was wrapped in bundles of underwear and other articles of clothing. Some items were secreted in two cake tins, two cigarette packages, and a cylindrical container. The defendant testified that his wife had packed these items in that fashion because they wanted to hide them from the Lebanese authorities as they feared confiscation at the Beirut airport upon their permanent departure from Lebanon. Such an explanation may sound implausible to an American citizen residing in California, but sometimes it is hard for us to understand the fears that plague the minds of people living in foreign lands under different political conditions.

The defendant is an Armenian. He was born in Turkey, where he attended grade school until age 10. The defendant's wife is also an Armenian, and she also terminated her formal education at an early age. After the defendant left school, he apprenticed as a watchmaker. At one time he owned a small business in Istanbul, but it was destroyed by looters during a riot. Thereafter he left for Lebanon, where he married, raised a family, and started a new business.

In December 1970 the Kismetoglus decided to leave Lebanon because of political unrest and turmoil. Before their departure they sold their jewelry store and about 40% of its inventory. They were unable to sell the balance of the inventory and so were forced to take it with them as they left Lebanon.

In Turkey and in Lebanon the defendant lived as a small shopkeeper and a member of an ethnic minority—certainly a precarious position. It is understandable that the Kismetoglus felt vulnerable and feared confiscation of their property by Lebanese airport guards.

Shortly before their arrival at Los Angeles International Airport, while the plane was still airborne, a Lufthansa stewardess distributed certain immigration and customs forms. Although the defendant and his wife speak some English, neither is fluent in the language. Mrs. Kismetoglu completed the forms—her husband, as I recall his testimony, was tending to the children—and she wrote down that they had nothing to declare. She testified that she was confused and understood the word "customs" on the form to signify "traditions" or "habits" rather than to refer to border inspection.

At the customs inspection counter at the Los Angeles airport, Kismetoglu, in English, was asked if he had anything to declare, and he answered, "No." The question was repeated; the answer was the same. The inspector, as I recall the evidence, spotted a bulge in his coat pocket, removed the contents, found jewelry, and a search through all the luggage commenced. Somewhere along the line, because of the language barrier, an interpreter was found and brought forward. The jewelry, which represents most of the defendant's lifetime possessions, was confiscated and the defendant arrested.

In addition, the Lufthansa plane had been late on arrival, and the family was being rushed by the Lufthansa personnel so that they could make connections with the last flight to Fresno, where Kismetoglu's brother was waiting at the airport.

Kismetoglu would have had to be stupid to suppose that he could sneak all of this jewelry through customs without detection. I think his failure to make an oral declaration was most likely caused by the interplay of a number of factors: the language barrier; the pressure to catch the last flight to Fresno; the general confusion that exists at air-

ports; and a lack of understanding of what was required of him, which was attributable, in part, to the manner in which the customs information had been conveyed.

In order to enter the United States the defendant was required to obtain a visa from the United States consular officials in Beirut. The defendant's appearance before the American consular officials provided an excellent opportunity for our people in Beirut to give him some brief explanation of our customs requirements or, at least, to hand him an instruction sheet in his own language outlining the items that must be declared upon entry. Unfortunately, however, this apparently is not the practice.

Instead of employing our people to inform foreign travelers of our customs requirements, our government places its primary reliance upon airline personnel. Stewardesses give the instructions while the plane is airborne. In this case, the Lufthansa plane, no doubt, was filled with tourists. The Lufthansa stewardess spoke over the intercom; immigration and customs forms were distributed; and a brief explanation of what the forms were all about was given. Since the airlines deal mainly with tourists, the explanation most likely emphasized the declaration of souvenirs and similar isolated items that the passenger might have purchased during the course of his trip. In any event, no stewardess testified, and there is no evidence regarding what instructions were given or what language they were given in.

It seems, in other words, that the methods used to pass vital customs information to foreigners such as Kismetoglu are haphazard. Our government may well bear some of the responsibility for the unhappy events of June 4.

Kismetoglu is neither a sophisticated businessman nor an experienced traveler. He has no criminal record; he has led a law-abiding life. The probation report observes—and I concur in this conclusion—that he is not a professional smuggler. The probation report states, in the first paragraph on page 6,

"Awaiting judgment is a defendant, who, in the opinion of the undersigned, is not a professional smuggler. Rather, it is believed that this defendant personifies one who has struggled much of his life, only in an attempt to earn a decent and respectable living for himself and family. Although it is conceivable that he had some idea that his representations to the Customs Inspector may have been somewhat incriminating, at the same time it is believed that he may have done so because of unfamiliarity with the requirements and also out of fear of becoming dispossessed of his lifetime possessions."

▋ When examined in its entirety and in the light most favorable to the government, the evidence is insufficient to permit a jury to conclude beyond a reasonable doubt and to a moral certainty that all the elements of the offense exist. There is too much evidence undermining the government's contention that the defendant acted with the specific intent to defraud the United States to permit the conviction to stand. Moreover, because of the language barrier and the haphazard manner in which our government acted to inform the defendant of our customs requirements, it is doubtful that either the distribution of the customs forms aboard the Lufthansa airplane or the conversation with the customs inspector that preceded the search of the defendant's coat and luggage can realistically be described as opportunities to declare merchandise. The Court concludes, in short, that Kismetoglu had no realistic opportunity to comply with the customs laws by declaring the watches and jewelry.

I believe that the jury's verdict in this case amounts to a miscarriage of justice. Of course, injustice, cruelty, and harshness are no strangers to an Armenian in other lands, but they should be strangers in the United States of America. My job is to administer justice to rich and

poor alike with understanding and compassion. To cure what I believe is a miscarriage of justice, I grant the defendant's motion for judgment of acquittal and find that he is innocent of the charges set out in the Indictment.

It is adjudged that the defendant's motion for judgment of acquittal is hereby granted and that the defendant is for that reason acquitted of the charges set forth in the aforesaid Indictment.

It is further adjudged that the defendant be discharged and that the defendant's bail be exonerated.

It is ordered that the defendant's passport and the defendant's wife's passport, which are now in the custody of the Clerk of the Court, be returned forthwith by the Clerk to the defendant and his wife.

It is further ordered that the watches and jewelry that are now in the custody of the Clerk of the Court and that were heretofore marked and received into evidence as Government's Exhibit "4" be returned by the Clerk to the defendant so that the defendant may declare the watches and jewelry to and present them for inspection by the Bureau of Customs at Los Angeles International Airport and may then either (1) upon payment to the Bureau of Customs of the appropriate duties, bring those items that may legally enter the United States into this country and make such other disposition as the customs laws and regulations permit of those items that may not legally enter the United States or (2) in the event that the defendant does not remain in the United States, entrust the watches and jewelry to the custody of the Bureau of Customs for storage and subsequent shipment to the defendant, pursuant to the customs laws and regulations that govern such storage and shipment, at the defendant's future destination outside the United States. It is the intention of the Court, in issuing this judgment and order, to, in effect, place the defendant, upon the receipt by him of the said watches and jewelry, back in line at the customs counter at Los Angeles International Airport in the position of a person who at that moment is entering the United States with merchandise that the customs laws require to be declared.

It is further ordered, on the basis of all proceedings had herein during the afternoon of October 6, 1971, that all agents of the government be and hereby are restrained from the performance of any acts that might interfere with the effectiveness of this judgment and order, including but not limited to the portion thereof contained in the preceding paragraph. This restraint shall remain in effect until such time as the Court, upon motion of the government or the defendant or upon its own motion, and after due notice to all parties herein, shall issue a further order.

It is further ordered that the Court shall retain jurisdiction over this matter for the purpose of making such further orders or modifications of orders as the interests of justice may require.